*R. D. Meader* and *E. C. Butts,* for plaintiffs.
*Conyers & Wilcox,* for defendant.

---

## SCOTT *v.* THE STATE.

1. Neither the law of voluntary manslaughter as contained in section 65 of the Penal Code nor that of voluntary manslaughter as involved in mutual combat is involved in this case, and the court did not err in failing to instruct the jury upon those subjects. Nor did the court err in failing to charge section 40 of the Penal Code, relating to crimes or misdemeanors committed by misfortune or accident.

2. The court did not err in refusing to give the charges requested in writing offered by the defendant.

3. The portions of the charge excepted to were substantially correct propositions of law applicable to the facts of the case and the issues made therein.

No. 3629. December 19, 1923.

Murder. Before Judge Mathews. Bibb superior court. January 31, 1923.

*John R. Cooper* and *W. O. Cooper Jr.,* for plaintiff in error.

*George M. Napier,* attorney-general, *Charles H. Garrett,* solicitor-general, and *Seward M. Smith,* asst. atty.-gen., contra.

BECK, P. J. Under an indictment charging him with the murder of one Moses Lucas, the defendant was tried and convicted, and was sentenced to life imprisonment in the penitentiary. He thereupon made a motion for a new trial, which was overruled.

1.  · The evidence for the State shows that on September 19, 1922, the accused shot and killed Moses Lucas; that on September 18, the day before the commission of the homicide, the accused went to the store of Henry Lucas, the son of the decedent. According to the testimony of Henry, he and his wife were at the store about 8 or 9 o'clock in the evening; the defendant came in, called to the witness, and asked him where his wife was; witness replied that

he did not know; and thereupon the accused called him a —— ——
liar. Witness saw a pistol in Scott's possession. After an inter-
change of a few words, Scott seemed to be somewhat appeased, but
still retained the threatening air and called witness out twice after-
wards. The next afternoon, the day of the homicide, the accused
came to witness's store again, where the witness and his wife and
two children were. Witness asked Scott to come in and sit down,
which he did after a minute or two. And then, in the language of
the witness, "He remarked he wanted satisfaction; and then he says,
'Wait a minute,' and he got up and went back home, but was not
gone over two or three minutes, and he came back to the door and
says, '—— damn it, I want satisfaction. I am as —— damn hot·
now as I was last night;' and I says, 'What is the matter with
you,' and he says, 'I don't believe nothing you say; you are a ——
damn liar,' and he began some accusations relative to his wife and
my relations, to the effect that I was guilty of having kept his wife
away from some date, I don't remember now; and I could see the
butt of his pistol in his pocket, and I tried to talk to him, and he
cut me off, and he declared he came to kill me and told me to
come on out there. He says, 'I don't want to kill you and your
wife both, but I am going to kill you; I came to do that;' and just
about that time a little boy came in for some oil, and I went to the
door to see if anybody was near, and he caught me at the door un-
prepared. I did not have a pistol on me, but it was in a box on
my counter. I waited on the boy that came for the oil, Lester
Battle; and Scott kept raging, and I started like I was going to
put the money in the box, and he says, 'You are the same man that
followed me one night,' and about that time he begun to pull his
pistol out of his pocket, and I shot him twice, and he fell, and I
ran to the door and covered him and watched him a minute or so,
and he groaned and twisted and opened his eyes and started his
hand to his pocket, and I shot him again in the breast, and then
I shot him again when he turned over on his side. He had his
pistol in his right breeches pocket. I did not know my father,
Moses Lucas, was there; I did not see him at all during the fight
with Scott. When I fired the last two shots Scott jumped up and
ran, and I walked in the store. I then heard two more shots when
I was about the middle of the store, and then I got my rifle and
went out there; and I saw my father bent down like this, holding

his stomach, and he says, 'That boy shot me twice for nothing.' My store is about 18 feet long, and I was about half way it, and I stepped immediately on the sidewalk and saw my father immediately, and he came down the street to me, and about this time an automobile rolled up, and I put my father in it and sent him to the hospital. . . I did not see my father have any weapon; he did not own a pistol." Moses Lucas died three days later. Witness testified, on cross-examination, that he fired the first, second, third, and fourth shots; that he shot Scott four times, once in the breast while he was down, and then shot him in the back when he was down; but that he shot him the first time before defendant had his pistol out of his pocket. He shot defendant one time with his rifle after defendant had shot his father; defendant shot at him after he had shot defendant, but missed him.

Emma Lucas, the wife of Henry Lucas, testified that on the night of the 18th of September Scott came to the store and accused her husband of improper relations with his wife; said that he was going to kill her husband; he was armed with a pistol. Scott was cursing and threatening to kill her husband, Henry Lucas. She was also present the next afternoon when Henry Scott came into the store and said, "Wait a minute;" he went out of the store and came back immediately, told her husband to come out, that he wanted to talk to him, and said, "I am going to kill you, come out;" said that he did not want to kill both of us; and her husband said, "You won't allow me to say anything to you," and Scott had his pistol in his front side pocket and never took his hand off of it.

. . "My husband went behind the counter to wait on a customer and to put the money received in a box, and Henry Scott was threatening all the time to kill him. My husband's pistol was on the counter, and Henry Scott was standing in the door with his hand on his pistol, and my husband shot him, and Scott fell out of the door with his hand still on his pistol. And I thought he was trying to get a chance to shoot my husband. He looked up and saw my husband standing in the door and had him covered, and Scott shot him when he was fixing to get up, and then Scott jumped up and ran, and almost in the same breath I heard him shoot again, that is, Henry Scott, and he shot two or three times. . . After I heard Scott shoot, my husband came into the store and got his rifle and shot one time. Old man Moses Lucas did not have a gun or pistol."

- The deputy sheriff of Bibb county was also introduced as a witness for the State, and testified that when the officers brought Henry Scott down the street to put him in the ambulance, "to the best of my recollection he said, '—— —— you, I come to get you, but you beat me to it.'" Another deputy testified: "I was at the hospital after Henry Scott was carried there, and I asked him if he had any trouble with old man Moses, and why he shot him; and he said he hadn't any trouble with him, that when he got up off of the ground the old man was the first person he saw, and he was walking towards him, and he shot him."

The evidence for the State clearly shows that the defendant went to the store of Henry Lucas, the son of the decedent, with the avowed intent to kill him; that he was armed with a pistol, which was visible to bystanders; that he used most abusive language to Henry Lucas, repeatedly threatening to kill him; that Henry Lucas was unarmed, but went behind a counter in the store where his pistol was in a box, took it therefrom, and shot the man who had come to the store the day before, threatening to kill him, and who came again on the evening of the homicide, repeating the threats and the abusive language, put his hand on his pistol, but before he drew it was shot by Henry Lucas. If the testimony of Henry Lucas and his wife is true, and it is strongly corroborated by the testimony of the officers of the law, then Lucas shot Scott because the latter had manifested a fixed purpose and determination to shoot him, with the present intent to carry that purpose into execution, with his hand on his pistol, and with threats on his lips. And even after he was shot down he declared to the man who shot him, "I come to get you, but you beat me to it." In his statement to the court and jury the defendant declared that upon receiving information that Henry Lucas had come to his store, "I went over there and he was towards the danding apartment, and he his wife by the counter, and I was gathering up some of my things, and in the meantime we were talking, and he says, 'I reckon you are moving,' and I says, 'Yes, I am thinking of leaving town,' and he says, 'You are a damn fool; I know where you got all that mess,' and I says, 'What you heard what you said last night,' and he says, 'You are a damn liar,' and that I didn't hear it, and I says, 'You did say it,' and in the meantime I went behind the counter to find a paper bag, and got my pistol and put it in my pocket, and I

started to leave, and he says, 'Wait, you are not satisfied,' and I says, 'No, I am not satisfied,' and a little boy come in to get some kerosene, and he goes behind the counter and comes back, and the next thing I knew he shot me, and when I first fell I couldn't move, and he continued shooting me, and I tried to get up, and when I went to wheel he was reversing his rifle, and I managed to get my pistol out of my pocket, and I shot four times, and when I was shooting I went to turn and some one shot me in the shoulder, and I tried to run, and it deadened the whole side, and when I got to the back of the store he shot at me with the rifle, and I had half way crawled and walked up the steps, and just as I got to the back door he shot again and shattered the glass all over me, and I sat down at the table right back of the store in a shed, and I come like directly in this little shed part of the dining-room window, and he come out of the back and threw something in a barrel of water, and he says, 'Oh, hell, Scott shot him.' In the meantime the officers came to arrest me. To tell the truth, I was nervous and scared and everything, and I reckon that I would have said anything to them, and one of the officers said to me, 'Did you shoot old man Moses Lucas? [I said] Yes, that I reckon that I did, but I have never seen old man Moses. I didn't see him at all. That is exactly the way the case was. They claim that I shot the old man, but I don't see how in the world that I shot him, because I was shooting in the store when I shot; but anyway, the old man could have got shot, but if I shot him I know I didn't shoot him intentionally, in fact I know that I didn't shoot him at all; and that is where he says the old man was, and I don't see why I didn't see him."

Under the evidence for the State Henry Lucas shot under circumstances that justified the act; and if he had killed the defendant, the shooting would have been justifiable. Under the facts as detailed in the statement of the accused, Henry Lucas opened fire on him without provocation; and if in thus firing upon him Henry Lucas had killed the defendant, the killing would have been murder. Under these facts and circumstances the law of voluntary manslaughter was not involved, and the court did not err in failing to instruct the jury upon that subject. Nor would it have been proper to give instructions to the jury upon the subject of voluntary manslaughter as involved in mutual combat, under the facts and circumstances as detailed by the witnesses or in the defendant's state-

ment; nor the section of the Penal Code declaring that a person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident.

2. The defendant requested the court in writing to give the following instructions to the jury: (a) "If the defendant provokes the difficulty and abandons the difficulty and then is set upon by Lucas and it becomes necessary for him to defend himself or his life, his right of self-defense is restored; and then if he kills believing that his life is in danger, he can kill and be justifiable." (b) "I charge you that there can be no murder without malice; and unless the State shows you that the defendant had malice against the deceased, you would not find him guilty of murder, but you should acquit him." (c) "I charge you that if in consequence of an assault upon the defendant which he did not provoke, the defendant shot at Henry Lucas, but missed him and shot and killed his father, no guilt would attach to the defendant, if the assault upon him was such as would have justified him in the killing of Henry Lucas. In such cases the killing would be homicide by misadventure, and you should acquit the defendant." The charges thus requested were not accurate in their statement of the law applicable to the facts of the case, and the court did not err in refusing to charge them; especially as the court instructed the jury in the charge given that "If Henry Lucas was the assailant or aggressor in this case, and if he began to shoot at the defendant, or did shoot at him without any justification on the part of Henry Lucas, if Henry Lucas would not be justified in shooting at the defendant, and if the defendant when Henry Lucas was thus shooting at him unjustifiably drew his pistol and attempted to shoot Henry Lucas, then he would not be guilty of any offense; that is, if the defendant, in good faith, shot at Henry Lucas when Henry Lucas had begun the difficulty and had drawn his pistol and was shooting at him and likely to continue to shoot at him, if in good faith he shot at Henry Lucas he was justified at the time, and if in this shooting at Henry Lucas under circumstances of justification, or thinking he was shooting at Henry Lucas, and he shot Moses Lucas instead, then he would not be guilty of murder or any offense." The part of the charge last quoted sufficiently set forth the theory presented by the defendant's statement, that he shot at Henry Lucas after the latter had made an unjustifiable as-

sault with a deadly weapon upon him, and that while thus shoot-
ing, under circumstances that justified him, at Henry Lucas, he
inflicted the mortal wound upon Moses Lucas.

3.   Error is assigned, in several grounds of the motion for new
trial, upon the following portions of the court's charge:   (*a*) "I
charge you, gentlemen of the jury, that if this defendant shot at
Moses Lucas, being in possession of his faculties, if he intentionally
shot at Moses Lucas when Moses Lucas was making no effort to at-
tack him, if he deliberately shot at Moses Lucas and killed him,
intending to shoot Moses Lucas, then he is guilty of murder, pro-
vided Moses Lucas was doing nothing to give him any reasonable
ground to believe that it was necessary for him to shoot at Moses
Lucas in order to save his own life or to protect himself from any
kind of assault upon the part of Moses Lucas."   (*b*) "The defend-
ant in this case contends he did not intentionally shoot at Moses
Lucas, that he didn't see him and didn't shoot at him.   That is
an issue of fact for you to determine.   Did he intentionally shoot
at Moses Lucas, and Moses Lucas was not making any effort to
assault him or inflict any injury upon him whatever, or give him
any provocation?   If he did, and that was intentionally done on
his part, then he is guilty of murder."   (*c*) "It is contended in
this case, and it is a question for you to determine whether or not
the defendant· shot Moses Lucas in an attempt or effort of shooting
and killing Henry Lucas.   Now, if you should decide in this case
that it is not shown beyond a reasonable doubt that this defendant
intentionally shot at Moses Lucas, you will then consider whether
or not he shot Moses Lucas in an effort to shoot Henry Lucas."
(*d*) "I charge you that if he shot at Henry Lucas, and by in-
advertence, intending to shoot Henry Lucas, he shot Moses Lucas,
then he would be guilty of such offense as he would be guilty of had
he shot and killed Henry Lucas.   Where one man shoots at another
and kills a third party accidentally, that is, not intending to kill
the third party, but intending to kill the other party at whom he
shoots, then he is guilty of the same offense as though he shot and
killed the person at whom he shot or intended to shoot.   So that
brings you to consider the question whether or not, if the defendant
had shot and killed Henry Lucas, under the circumstances under
which he was then placed he would be guilty of murder, or any
other offense."   (*e*) "The State contends in this case the facts are

not that way. The State contends that Henry Lucas was justified in what he did in shooting at Henry Scott, upon the same law of self-defense I have given you in charge; that Henry Scott was making an effort to shoot him and by his language and conduct gave him ground to believe then and there it was necessary for him to shoot Scott in order to save his own life, and that he acted in good faith under that necessity, or that apparent necessity. Now, if that be true, if this defendant was the aggressor, if he made it necessary for Henry Lucas to shoot him in order to save his own life, and Henry Lucas did no more than he was justified in doing, and if the defendant, after having begun the difficulty, had drawn his pistol or attempted to draw it, and then shot Moses Lucas, then the defendant would be guilty of murder, because they both could not be justified—if Henry Lucas was justifiable in shooting him, he could not be justifiable in shooting Henry Lucas."

There is no merit to the exceptions to these charges. The propositions of law laid down in these paragraphs are substantial statements of law applicable to the case, and sufficiently cover the issues dealt with in the charges, when considered in connection with the entire charge.

       *Judgment affirmed. All the Justices concur, except*

RUSSELL, C. J., and ATKINSON, J., who dissent on the ground that the court erred in failing to charge on the subject of voluntary manslaughter as embodied in sec. 65 of the Penal Code, and that the court also erred in failing to charge on the subject of voluntary manslaughter involved in the theory of mutual combat.